# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

RUSORO MINING LIMITED,

    Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

    Defendant.

Case No. 21-mc-00481-UNA

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR AN ORDER AUTHORIZING THE ISSUANCE OF A WRIT OF ATTACHMENT *FIERI FACIAS* AND A FINDING THAT REASONABLE TIME HAS PASSED TO EXECUTE JUDGMENT PURSUANT TO 28 U.S.C. § 1610(C)

R. Craig Martin (DE Bar No. 005032)

DLA Piper LLP (US)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
Tel: (302) 468-5655
Fax: (302) 778-7834
*Craig.Martin@us.dlapiper.com*

James E. Berger
Charlene C. Sun
Joshua S. Wan
Katherine A. Ibarra
Tamara Hilmi

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4715
Fax: (212) 884-8715
*James.Berger@us.dlapiper.com*
*Charlene.Sun@us.dlapiper.com*
*Joshua.Wan@us.dlapiper.com*
*Kathy.Ibarra@us.dlapiper.com*
*Tamara.Hilmi@us.dlapiper.com*

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

**Page**

I.  PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................. 3

  A.  The Arbitration ................................................................................................ 3

  B.  The Judgment ................................................................................................ 4

  C.  Venezuela's Extensive Control Over PDVSA ............................................... 4

    1.  This Court's August 2018 Alter Ego Decision in Crystallex and
        Subsequent Events in this Court .......................................................... 4

    2.  Venezuela ............................................................................................. 6

    3.  PDVSA ................................................................................................. 8

      a.  Background ............................................................................. 8

      b.  Venezuela's Extensive Control of PDVSA Through and
          Including August 2018 ........................................................... 9

      c.  Venezuela's Extensive Control Following the Crystallex
          Court's 2018 Ruling ............................................................... 12

        i.   The Ad Hoc Board Appointed by Guaidó Has No
             Authority Over PDVSA ............................................ 12

        ii.  The Maduro Regime's Continued Control Over the
             Management and Operations of PDVSA ................. 13

        iii. The Venezuelan State's Economic Control Over
             PDVSA ..................................................................... 15

        iv.  The Venezuelan State's Continued Use of PDVSA
             Assets for Its Own Benefit ...................................... 17

        v.   Use of PDVSA as State Information Ministry ......... 20

        vi.  The U.S. Sanctions Regime ..................................... 20

        vii. The Guaidó Government ........................................... 22

III. ARGUMENT ..................................................................................................... 25

  A.  Venezuela Owns Property in this District Through Its Alter Ego PDVSA ......... 25

    1.  Alter Ego Doctrine .............................................................................. 25

    2.  Venezuela is Collaterally Estopped from Arguing that PDVSA is
        not an Alter Ego of Venezuela ........................................................... 26

    3.  PDVSA Continues to Be an Alter Ego of Venezuela ........................... 28

      a.  Factor 1: Venezuela Retains Economic Control of PDVSA ........ 28

      b.  Factor 2: PDVSA's Profits Go to Venezuela .......................... 29

c. Factor 3: Venezuelan State Officials Manage PDVSA and Are Closely Involved in PDVSA's Daily Affairs.................................. 29

d. Factor 4: Venezuela Is the Real Beneficiary of PDVSA's Conduct ............................................................................ 29

e. Factor 5: Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States While Avoiding Its Obligations .................................................................... 31

4. Recognition of the Guaidó Government Does Not Change the Analysis.............................................................................. 32

a. Recognition of the Guaidó Government Is Legally Irrelevant ..... 32

b. Mr. Guaidó's Actions Themselves Support an Alter Ego Finding ........................................................................... 32

5. PDVSA's Shares of PDVH are Located in the United States ................. 33

B. Rusoro Satisfies the Remaining Jurisdiction Requirements Under the FSIA....... 33

1. An Exception to Jurisdictional Immunity Applies.................................... 33

2. A Reasonable Period of Time Has Elapsed Following the Entry of Judgment and Relief Pursuant to 28 U.S.C. § 1610(c) is Warranted........ 34

3. An Exception to Immunity from Attachment or Execution Applies ........ 35

4. The Property to Be Attached Is Used for a Commercial Activity in the United States ....................................................................... 35

C. PDVH's Shares May Be Attached Under Delaware Law .................................. 36

D. OFAC Sanctions Do Not Preclude Granting the Requested Relief..................... 36

IV. CONCLUSION.................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Buckhead America Corp.*,
    178 B.R. 956 (D. Del. 1994) ....................................................................30

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez. ("Crystallex I")*,
    333 F. Supp. 3d 380 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ...................... *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez. ("Crystallex II")*,
    932 F.3d 126 (3d Cir. 2019), *cert. denied*, *Bolivarian Republic of Venez. v.
    Crystallex Int'l Corp.*, 206 L.Ed.2d 936 (2020) ........................................... *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
    No. 16-cv-00661-RC, Order (D.D.C. June 9, 2017) ...............................................34

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
    2019 WL 6785504 (D. Del. Dec. 12, 2019) ...................................................26, 27

*D'Angelo v. Petroleos Mexicanos*,
    378 F. Supp. 1034 (D. Del. 1974) ..............................................................33

*Energy Marine Servs., Inc. v. DB Mobility Logistics AG*,
    2016 WL 284432 (D. Del. Jan. 22, 2016) ........................................................27

*Federal Deposit Ins. Corp. v. Sea Pines Co.*,
    692 F.2d 973 (4th Cir. 1982) ..................................................................30

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ........................................................................ *passim*

*In re Graham*,
    973 F.2d 1089 (3d Cir. 1992) ..................................................................26

*Greene v. New Dna Perfume Corp.*,
    287 B.R. 328 (Bankr. D. Del. 2002) .............................................................27

*Groden v. N&D Transp. Co.*,
    866 F.3d 22 (1st Cir. 2017) ...................................................................27

*Harrison v. Soroof Int'l, Inc.*,
    320 F. Supp. 3d 602 (D. Del. 2018) ............................................................27

*Jaffe v. Grant*,
    793 F.2d 1182 (11th Cir. 1986) ................................................................27

*Jiménez v. Palacios*,
    250 A.3d 814 (Del. Ct. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020) ................... *passim*

*Nat'l Oil Corp. v. Libyan Sun Oil Co.*,
    733 F. Supp. 800 (D. Del. 1990) .......................................................................37

*Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic
    of Venez.*,
    20-mc-257 (D. Del. July 31, 2020) ...................................................................2, 6

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*,
    419 F. Supp. 3d 51 (D.D.C. 2019) .....................................................................35

*OI European v. Bolivarian Republic of Venez.*,
    19-mc-00290 (D. Del. Nov. 4, 2019) ....................................................................2

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ...............................................................................30

*Petroleos De Venez. S.A. et al v. MUFG Union Bank, N.A. et al*,
    No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), D.I. 117 .....................................25

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
    2020 WL 6135761 (S.D.N.Y. Oct. 16, 2020) ....................................................24

*Phillips Petroleum Company Venezuela Limited v. Petroleos de Venezuela, S.A.*,
    19-mc-00342 (D. Del. Nov. 26, 2019) ............................................................2, 5, 6

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 .......................................................................................................35

*Republic of Iraq v. ABB AG*,
    768 F.3d 145 (2d Cir. 2014) ..........................................................................26, 32

*Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.*,
    18-7044 (D.C. Cir. Sept. 17, 2021), D.I. 1914520 .........................................2, 6

*Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.*,
    21-mc-481 (D. Del. Nov. 5, 2021), D.I. 1..........................................................2

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
    16-cv-2020 (D.D.C. Mar. 2, 2018), D.I. 22 ...........................................1, 4, 33, 35

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
    300 F. Supp. 3d 137 (D.D.C. 2018) .................................................................3, 4

*Tidewater Investment SRL, et al. v. Bolivarian Republic of Venez.*,
    19-mc-00079 (D. Del. April 3, 2019) .............................................................2, 5, 6

*Trs. Of Nat'l Elevator Indus. Pension v. Lutyk*,
    140 F. Supp. 2d 447 (E.D. Pa. 2001), *aff'd sub nom.*, 332 F.3d 188 (3d Cir.
    2003) ........................................................................................................28

*Twin City Pipe Trades Serv. Assoc, Inc. v. Wenner Quality Servs., Inc.*,
    869 F.3d 672 (8th Cir. 2017) ....................................................................27

*UMS Partners, Ltd. v. Jackson*,
    1995 WL 413395 (Del. Super. Ct. June 15, 1995) ..................................36

*Wilmington Tr. Co. v. Barron*,
    470 A.2d 257 (Del. 1983) ..........................................................................36

*Zivotofsky ex rel. Zivotofsky v. Secretary of State*,
    725 F.3d 197 (D.C. Cir. 2013), *aff'd,* 576 U.S. 1 (2015).........................32

**Statutes**

8 Del. C. § 169 .................................................................................................33

8 Del. C. § 324 .................................................................................................36

10 Del. C. § 5031 .............................................................................................36

28 U.S.C. § 1605(a)(6) .....................................................................................34

28 U.S.C. § 1610(a) .........................................................................................35

28 U.S.C. § 1961...............................................................................................4

28 U.S.C. § 1963...............................................................................................34

28 U.S.C. § 1610(c) .............................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 69.............................................................................................36

Restatement (Third) of Foreign Relations Law § 201 (1987)........................32

Plaintiff and judgment creditor Rusoro Mining Limited ("Rusoro") respectfully submits this memorandum of law in support of its motion for an order: (i) finding, pursuant to Section 1610(c) of the Foreign Sovereign Immunities Act ("FSIA"), that a reasonable period of time has elapsed following the entry of a judgment in favor of Rusoro and against the Bolivarian Republic of Venezuela ("Venezuela") (the "Judgment") to permit execution in aid of the Judgment; (ii) finding that Petróleos de Venezuela, S.A. ("PDVSA"), the state-owned petroleum company of Venezuela, is an alter-ego of the Venezuelan state, and that the Judgment may be enforced against the shares of Delaware corporation PDV Holding Inc. ("PDVH"), which are owned by PDVSA; and (iii) authorizing the Clerk of Court to issue a writ of attachment *fieri facias* against the shares of PDVH.  The Court should grant the motion, for all the reasons that follow.

## I.    PRELIMINARY STATEMENT

Over five years ago, on August 22, 2016, an arbitral tribunal issued a final arbitration award against Venezuela and in favor of Rusoro, ordering Venezuela to pay nearly $1 billion in damages, plus interest, to Rusoro in connection with the Venezuelan government's expropriation of Rusoro's gold-mining assets in Venezuela (the "Award").  Nearly four years ago, on March 2, 2018, the United States District Court for the District of Columbia (the "D.C. Court") recognized the Award and entered the Judgment.[1]  *Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 16-cv-2020 (D.D.C. Mar. 2, 2018), D.I. 22.

Venezuela attempted to annul the Award in France, the seat of the arbitration.  Initially, the Paris Court of Appeals partially annulled the damages portion of the Award in January 2019, while

---

[1]    After the D.C. Court entered the Judgment, the parties negotiated a settlement agreement whereby Venezuela agreed to pay Rusoro periodic installments (the "Settlement").  Venezuela agreed to pay Rusoro an initial installment in November 2018.  Declaration of Charlene C. Sun, dated February 8, 2022 ("Sun Decl.") at ¶ 6. Venezuela, however, failed to make the first payment, and it has not made a single payment under the parties' agreed payment schedule.  *Id.* at ¶ 7.

upholding the arbitral tribunal's finding on the merits that Venezuela had unlawfully expropriated Rusoro's investments. However, the French Supreme Court, the *Cour de Cassation*, reversed the decision of the Paris Court of Appeal annulling the damages portion of the Award, and reinstated the Award in full on March 31, 2021. *Id.* at ¶ 8. Nearly nine months have passed since the *Cour de Cassation* reinstated the Award, and yet Venezuela still has not satisfied any part of the Award or Judgment.[2] Instead, Venezuela commenced another proceeding in the French courts through which it is again trying to have the Award set aside. *Id.* In this subsequent action, Venezuela is raising the same grounds for annulment it had already raised in the first annulment action. *Id.*

While these events were unfolding, Venezuela's other creditors, all but one of whose judgments post-date Rusoro's, have been lining up to lay claim to a finite pool of Venezuelan assets located in Delaware. There are at least five other creditors currently seeking to satisfy, through attachment proceedings in this Court, approximately $3.7 billion worth of collective judgments entered against either Venezuela or PDVSA in the United States. *See Crystallex v. Bolivarian Republic of Venez.*, 17-mc-00151 (D. Del. June 20, 2017) ($1.2 billion judgment); *Phillips Petroleum Company Venezuela Limited v. Petroleos de Venezuela, S.A.*, 19-mc-00342 (D. Del. Nov. 26, 2019) ($2 billion judgment); *OI European v. Bolivarian Republic of Venez.*, 19-mc-00290 (D. Del. Nov. 4, 2019) ($372.5 million judgment); *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venez.*, Case 20-mc-257 (D. Del. July 31, 2020) ($138 million judgment); *Tidewater Investment SRL, et al. v. Bolivarian Republic of Venez.*, 19-mc-00079 (D. Del. April 3, 2019) ($36.4 million judgment). Each of those creditors obtained a judgment against Venezuela or PDVSA in a jurisdiction other than Delaware, though each has

---

[2]     On September 17, 2021, Venezuela and Rusoro stipulated to the dismissal of Venezuela's appeal of the Judgment. *Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.*, 18-7044 (D.C. Cir. Sept. 17, 2021), D.I. 1914520. Subsequently, on November 5, 2021, Rusoro registered the Judgment in this District. *Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.*, 21-mc-481, (D. Del. Nov. 5, 2021), D.I. 1.

commenced enforcement proceedings in this District in an attempt to execute against the shares of PDVH.

To date, Venezuela has not satisfied any portion of the Award.  As a result, Rusoro seeks an order authorizing the Clerk of Court to issue a writ of attachment against the shares of PDVH, which are titled to PDVSA, an alter ego of Venezuela.

## II.     FACTUAL BACKGROUND

### A.     The Arbitration

Judgment creditor Rusoro is a Canadian gold mining company listed on the Toronto Stock Exchange.  *Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 300 F. Supp. 3d 137, 141 (D.D.C. 2018).  Between 2006 and 2008, Rusoro acquired controlling interests in twenty-four Venezuelan companies, which collectively held a total of fifty-eight mining concessions and contracts in Venezuela.  *Id*. at 142.  Much like Crystallex International Corp. ("Crystallex"), another Canadian gold mining company that obtained an attachment of PDVH's shares in this District, Rusoro suffered an unlawful expropriation under the regime of former Venezuelan President Hugo Chávez after President Chávez issued a decree in 2011 that asserted state control over the property and mining rights of all gold-producing companies in Venezuela.  *Id*. at 143.

On July 17, 2012, Rusoro commenced arbitration proceedings against Venezuela pursuant to the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes and the July 1, 1996 Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, claiming that Venezuela had expropriated its investment without payment of compensation.  *Id*.

On August 22, 2016, the tribunal issued the Award, finding that Venezuela had unlawfully expropriated Rusoro's mining portfolio without compensation and ordering Venezuela to pay $966.5 million in damages, plus interest, to Rusoro.  *Id*. at 143-44.

**B.      The Judgment**

After Venezuela refused to voluntarily satisfy the Award, Rusoro commenced enforcement proceedings in the United States.  On March 2, 2018, the D.C. Court recognized the Award and entered judgment against Venezuela in the amount of $967,777,002.00, plus (i) interest as provided by the arbitral tribunal; (ii) post-judgment interest, pursuant to 28 U.S.C. § 1961, accruing through the date of payment; and (iii) costs as provided by the arbitral tribunal, in the amount of $3,302,500.00.  *Id.* at 151; *see also Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 16-cv-2020 (D.D.C. Mar. 2, 2018), D.I. 22.

**C.      Venezuela's Extensive Control Over PDVSA**

**1.      This Court's August 2018 Alter Ego Decision in *Crystallex* and Subsequent Events in this Court**

On June 19, 2017, Crystallex registered a judgment from the United States District Court for the District of Columbia in this District; like Rusoro's judgment, the Crystallex judgment resulted from the recognition of an arbitration award involving Venezuela's expropriation of gold mining assets.  On August 9, 2018, on Crystallex's motion, this Court found that PDVSA was Venezuela's alter ego and that Crystallex could enforce its judgment against assets of PDVSA that are located in Delaware.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez. ("Crystallex I"),* 333 F. Supp. 3d 380, 386-91 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) (applying the test for setting aside the presumption of separateness between a State and its instrumentality set forth in *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 627 (1983) ("*Bancec*"))*.*  The record in *Crystallex I* proved that the Venezuelan state exerted pervasive control over PDVSA, "including its day-to-day operations" thus "rendering PDVSA the alter ego of Venezuela."  *Crystallex I*, 333 F. Supp. 3d at 399.  Accordingly, the Court held that Crystallex, as Venezuela's judgment creditor, could attach the PDVH shares located in this District consistent

with the FSIA because they were the property of Venezuela's alter ego—and thus of Venezuela itself—used in commerce. *See id.* at 418 ("As Crystallex states, 'it is difficult to imagine property with more of a commercial use than shares of a Delaware for-profit corporation that itself owns, through an intermediate holding company, a multi-billion dollar Delaware petroleum corporation. . .'") (internal citations omitted). The Third Circuit affirmed and the Supreme Court denied *certiorari* in May 2020. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez. ("Crystallex II")*, 932 F.3d 126 (3d Cir. 2019), *cert. denied*, *Bolivarian Republic of Venez. v. Crystallex Int'l Corp.*, 206 L.Ed.2d 936 (2020).

Since this Court's decision in *Crystallex*, at least four more judgment creditors have registered their judgments in this District and filed motions to attach PDVSA's shares in PDVH. As reflected in the table below, Rusoro's Judgment confirming the Award, which the D.C. Court rendered on March 2, 2018, predates the judgments of all but one of these creditors.

| No. | Case Name | Date of Award | Date of Judgment | Amount (exclusive of interest) |
|---|---|---|---|---|
| 1 | *Crystallex International Corporation v. Bolivarian Republic Venez.* | April 4, 2016 | April 7, 2017 (D.D.C.) | $1.2 billion |
| 2 | *Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.* | August 22, 2016 | March 2, 2018 (D.D.C.) | $967.7 million |
| 3 | *Phillips Petroleum Company Venezuela Limited v. Petroleos de Venezuela, S.A.* | April 24, 2018 | August 22, 2018 (S.D.N.Y). | $2 billion |
| 4 | *Tidewater Investment SRL, et al. v. Bolivarian Republic of Venez.* | March 13, 2015 | January 25, 2019 (D.D.C.) | $46.6 million |
| 5 | *OI European Group B.V v. Bolivarian Republic of Venez.* | March 10, 2015 | May 21, 2019 (D.D.C.) | $372.5 million |
| 6 | *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venez.* | February 19, 2018 | June 4, 2020 (S.D. Miss.) | $138 million |

### 2. Venezuela

Venezuela is a sovereign state and judgment debtor of Rusoro. As the Court considers this motion, it is critical to keep sight of the fact that the Judgment lies against the Venezuelan *state*, not any particular government that holds power or claims to hold power at any particular time. Thus, while much has been said in this Court by other litigants about who is the rightful leader of Venezuela and who has the power to act on the Venezuelan state's behalf, those questions are irrelevant to the fact that the liability created by the Judgment is indelible and lies against the state, no matter who leads it. Further, as shown below, the evidence shows that each of the rivals claiming to be the rightful leader of Venezuela has used, or claims the right to use, PDVSA's assets for governmental ends, such that no matter *who* the Court finds is in charge of the Venezuelan government, that government claims to control PDVSA's assets and has used or sought to use PDVSA's assets to serve its own self-interested objectives.

In 2013, following the death of former President Hugo Chávez, Nicolás Maduro became Venezuela's president. *Jiménez v. Palacios*, 250 A.3d 814, 821 (Del. Ct. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020). In May 2017, when Maduro's political opponents gained control of Venezuela's duly-constituted and constitutional legislative body (the National Assembly), the Maduro regime formed a new legislative body, the National Constituent Assembly and granted it the power to legislate and to put opposition leaders on trial. *Id*. at *2-3.

In August 2018, when this Court ruled in *Crystallex I,* Maduro was both *de jure* and *de facto* President of Venezuela. On January 10, 2019, he claimed to have been re-elected after a disputed election. *Id.* at *3. Venezuela's National Assembly rejected the claim and named the opposition leader, Juan Guaidó, as "Interim President" of Venezuela. *Id.* On January 23, 2019, the President of the United States issued a statement that provided, in part, "Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim

President of Venezuela."  Declaration of Charlene C. Sun, dated February 8, 2022 ("Sun Decl."),

Ex. 1.  No spokesperson for the United States suggested or declared that the recognition of Guaidó

resulted in the establishment of a new *state*, or that the *de facto* government had changed.  To the

contrary, the United States acknowledged that Maduro continued to exercise *de facto* power as the

Venezuelan head of state.  *See* Sun Decl., Ex. 1 ("We continue to hold the illegitimate Maduro

regime directly responsible for any threats it may pose to the safety of the Venezuelan people.").

The U.S. government simply recognized Guaidó as Venezuela's official representative, *i.e.*, as the

person authorized *in the United States* to speak for Venezuela and to represent its interests.

     "Recognition," however, is an act of diplomacy and lives in the eye of the beholder; indeed,

different governments and international organizations have reacted differently to the power

struggle between Maduro and Guaidó.

- The United Nations—the world's pre-eminent convocation of sovereigns—recognized Venezuelan ambassadors appointed by the Maduro regime before August 2018, and has continued to do so through the present day.  Sun Decl., Ex. 2 (listing Mr. Samuel R. Moncada Acosta as the permanent representative of Venezuela—so-appointed by Nicolás Maduro—since December 19, 2017); Sun Decl., Ex 3 (reporting on U.N. General Assembly's "acceptance of the credentials submitted by Venezuela's government headed by Nicolas Maduro.").

- The European Union, the Lima Group and Canada recognized Guaidó as Venezuela's official representative in 2019, but as of today, no longer do so.  Sun Decl., Ex. 4 (noting that E.U. foreign policy chief Josep Borrell indicated that the E.U. would maintain engagement with "all actors" acting on behalf of Venezuela).

- Venezuela itself acknowledges the Maduro regime, which continues to exercise control over the state and over PDVSA through the present day.  *See infra* at Section II.C.3.c.

- While recognizing Guaidó as Venezuela's *representative,* the United States includes the "Maduro regime" in its definition of the "Government of Venezuela."  *See infra* at Section II.C.3.c.vi.

3.      **PDVSA**

    *a.      Background*

Venezuela is home to the "largest proven oil reserves in the world," *Jiménez*, 250 A.3d at 822, and sovereign control over the state's oil company is constitutionally mandated.[3]  As the Third Circuit has found, "the Venezuelan constitution . . . endows the State with significant control over PDVSA and the oil industry in the country."  *Crystallex II*, 932 F.3d at 147.  PDVSA was formed as the state oil concern in 1975, pursuant to Venezuela's Nationalization Law.  Sun Decl., Exs. 8, 9, 10 at ¶ 12.  PDVSA was in 2018—and remains today—a state-controlled commercial enterprise directed to "comply with and implement the policy on hydrocarbons enacted by the National Executive Branch."  Sun Decl., Ex. 11, Art. 1, *see also* Exs. 10 at ¶ 12, 14.  "PDVSA's Articles of Incorporation require that it adhere to policies established by the National Executive."  *Crystallex I*, 333 F. Supp. 3d at 408; Sun Decl., Ex. 10 at ¶ 18.

    PDVSA today operates a world-wide petroleum business, centered in Caracas, that encompasses all activities of the petroleum industry in Venezuela.[4]  Pursuant to its bylaws, "PDVSA plans, coordinates and controls the exploration, exploitation, transportation, manufacturing, refining, storage, commercialization, and other activities of its subsidiaries regarding crude oil and other hydrocarbons both in the territory of the Republic and abroad."  Sun

---

[3]    Article 12 of the Venezuelan Constitution provides hydrocarbon deposits within the territory of the state are the property of the Republic, and Article 302 of the same reiterates "the State reserves for itself, by means of the corresponding organic laws and due to reasons of national convenience, oil producing activities."  *See* Sun Decl., Ex. 6, Arts. 12, 302.  Article 303 of the Venezuelan Constitution addresses the state's control over PDVSA specifically: "Due to reasons of national economic, political, and strategic sovereignty, the State shall hold all of the shares in Petróleos de Venezuela, S.A."  *Id.* at Art. 303.  In addition, as PDVSA disclosed to bondholders, under Article 5 of the Organic Hydrocarbons Law, its revenues "shall be used to finance healthcare, education, the formation of macroeconomic stabilization funds, and productive investment, in such a way that an appropriate connection of oil and the domestic economy is achieved, all of it for the public welfare."  *See* Sun Decl., Ex. 7, Art. 5.

[4]    PDVSA's website lists twenty-eight direct subsidiaries across the world.  Only one (PDVH) is in the United States.  Sun Decl., Ex. 13.

Decl., Ex. 14 at ¶ 5.  By decree, PDVSA is governed by a Shareholder's Assembly and a board of directors.  Each has been under control of the Maduro regime at all times during and since 2018, as explained in more detail below.  While Guaidó formed a U.S.-recognized government in 2019 and subsequently purported to appoint his own board of directors for PDVSA (the "ad hoc board"), the ad hoc board has never acquired control—or even exerted influence—over PDVSA's operations.  Sun Decl., Exs. 4, 15.  As discussed in more detail below, today, as in 2018, the Maduro-controlled Shareholder's Assembly and PDVSA board have continued to review and approve the annual reports, financial statements and budgets of PDVSA, to dispose of the company's assets and properties, to transact with third parties, and to appoint the officers who manage its employees, its subsidiaries in Venezuela and abroad, and its headquarters in Caracas. Guaidó's group has been unable to diminish, in any meaningful way, Venezuela's dominance over PDVSA; importantly, and as discussed further below, there is no evidence that he has even tried. To the contrary, the evidence suggests that, like Maduro, Guaidó has treated PDVSA revenues and assets as assets of the Venezuelan state and has sought to use them in service of the government that he has attempted to establish.

PDVSA owns 100% of the shares of PDVH, a Delaware corporation, which in turn owns 100% of the shares of CITGO Holding, Inc.  Sun Decl., Ex. 16.  CITGO Holding, Inc. owns 100% of the shares of CITGO Petroleum Corp., a Delaware corporation headquartered in Texas.  Sun Decl., Ex. 16.

### b.    *Venezuela's Extensive Control of PDVSA Through and Including August 2018*

On August 9, 2018, this Court, applying the alter ego analysis set out in *Bancec*, ruled in *Crystallex I* that PDVSA was an alter ego of Venezuela and that shares of PDVH were subject to

attachment by a judgment creditor of Venezuela.  The Court's factual review was close and pervasive—and spanned multiple Venezuelan governments.  Among facts found were that:

- Venezuela used PDVSA's property as its own, *see Crystallex I,* 333 F. Supp. 3d at 406;

- Venezuela ignored PDVSA's separate status, *see id.* at 406-07;

- Venezuela deprived PDVSA of independence from close political control, *see id.* at 407-08;

- Venezuela required PDVSA to obtain government approvals for ordinary business decisions, *see id.* at 408-09; and

- Venezuela issued policies causing PDVSA to act directly on behalf of Venezuela, *see id.* at 409-10.

The Third Circuit affirmed this analysis, examining the five *Bancec* factors, namely: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."  *Crystallex II,* 932 F.3d at 140-41 (citing *Rubin v. Islamic Republic of Iran,* 138 S. Ct. 816, 823 (2018)).  As to the first factor, the court observed that PDVSA's 2011 and 2016 bond disclosures "leave no doubt Venezuela has the power to intervene and mandate PDVSA's economic policies."  *Crystallex II,* 932 F.3d at 146.  Moreover, the court answered the second factor in the affirmative, finding that "[a]s PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government."  The court observed that PDVSA pays Venezuela "extraordinary taxes," and royalties on the oil it produces, "*i.e.*, taxes at an artificial rate designed to collect more of PDVSA's revenues."  *Id.* at 148 (internal citations omitted).

Further, regarding the third factor, the Third Circuit found that "[t]he Venezuelan government exercises direct and extensive control over PDVSA." *Id.* at 148.  The court stated, "it has been 'commonplace,' since 2002 for PDVSA's president also to serve as Venezuela's oil minister … [which] allow[s] the Government to control the daily operations of PDVSA." *Id.* (internal citations omitted).  Moreover, the court found that "Venezuela has also wielded substantial influence over PDVSA's employees through a series of politically motivated firings." *Id.*  The court added that "[e]mployees continue to face pressure from the state today," and that employees "have been threatened with termination unless they voted in elections." *Id.*

Moving to the fourth factor under *Bancec*, the Third Circuit, citing to this Court's decision, stated that Venezuela uses PDVSA "to achieve its foreign policy goals by committing PDVSA to sell oil to certain Caribbean and Latin American nations at substantial discounts, without PDVSA's consent . . .  Even when those oil debts are repaid, the money is given to Venezuela, not PDVSA . . ." *Id.* at 148-49.  Therefore, the court held that "[t]his seamless transfer of value between PDVSA and Venezuela also suggests an alter ego relationship." *Id.*

As to the fifth and final *Bancec* factor, the court held that it is "clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system." *Id.* at 149.  This is because PDVSA's "2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations, and hence disputes stemming from default will be subject to U.S. laws and presumably resolved through the U.S. legal system." *Id.*  Moreover, the court found that "it is probable the U.S. legal system is the backstop that gives substantial assurance to investors who buy PDVSA's debt." *Id.*

c.   ***Venezuela's Extensive Control Following the Crystallex Court's 2018 Ruling***

At all times since August 2018, the Venezuelan state's dominance and control of PDVSA's commercial enterprise has persisted.  All of the factors that informed the *Crystallex I* court's 2018 decision remain true today.

i.   **The Ad Hoc Board Appointed by Guaidó Has No Authority Over PDVSA**

On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute").  *Jiménez*, 250 A.3d at 824.  The statute "specifically empowered Guaidó to 'appoint an *ad hoc* Managing Board' of PDVSA 'to exercise PDVSA's rights as a shareholder of PDV Holding.'"  *Id.*[5]  While this has led to U.S. recognition of corporate reorganizations at PDVSA's U.S. *subsidiaries* (which were undertaken at the direction of Guaidó), these actions have had no effect on *PDVSA itself*.  The state, through its political actors, continues to dominate and control PDVSA despite Guaidó's recognition.  The PDVSA website publishes the names of its board members.  No member of the ad hoc board is listed.  *Compare* Sun Decl., Ex. 17 *with* Sun Decl., Ex. 18.  Indeed, the members of the ad hoc board could not participate in PDVSA corporate governance even if they tried:  Members of the ad hoc board are subject to arrest warrants issued by Maduro's attorney general.  Sun Decl., Exs. 19, 20.  As CITGO Petroleum itself acknowledges, the Maduro regime continues to operate "through its control of PDVSA in Venezuela."  Sun Decl., Ex. 21.

---

[5]   On February 8, 2019, pursuant to the Transition Statute, "Guaido appointed five individuals as the *ad hoc* Managing Board of PDVSA 'for the purpose of carrying out all necessary actions to appoint a Board of Directors' for PDV Holding."  *Jiménez,* 2019 WL 3526479, at *6.

ii.     **The Maduro Regime's Continued Control Over the Management and Operations of PDVSA**

Soon after enactment of the Transition Statute, it became clear that the ad hoc board would be unable to diminish the state's extensive control over PDVSA.  In March 2019, PDVSA, acting entirely through Maduro-regime officers, announced the opening of an office in Moscow.  Manuel Quevedo—a Maduro loyalist and former Minister of Petroleum of Venezuela—declared that PDVSA intended to shift its focus toward Russia (which has steadfastly recognized Maduro as the legitimate president of Venezuela), and stated that "of course, Russia is one of the countries we want to co-operate with and where we want to increase supplies."  Sun Decl., Ex. 22.  Shortly thereafter, PDVSA set up a factoring arrangement with Rosneft (a Russian oil company headquartered in Moscow), by which customers of PDVSA would make payments for Venezuelan crude through Rosneft in order to allow PDVSA to avoid U.S. sanctions.  Sun Decl., Ex. 23.  In September 2019, a Maduro-appointed oil minister moved PDVSA's Lisbon office to Moscow to avoid the effect of U.S. and European sanctions.  Sun Decl., Ex. 25.

In July 2019, PDVSA was reported to be selling oil to a company in Turkey—another one of the few countries in the world that recognize Maduro as Venezuela's president—known as Grupo Iveex Insaat.  Turkish corporate records show that Grupo Iveex is owned by Miguel Silva, a Venezuelan businessman who had served as a housing ministry commissioner in Maduro's administration. Sun Decl., Ex. 24.  A month later, Reuters reported (from Caracas and elsewhere) that "Maduro has retained a firm grip on power in the OPEC nation" and continues to control PDVSA.  Sun Decl., Ex. 26.  In November 2019, Maduro pledged Venezuelan state funds to pay PDVSA's direct contract obligations for the completion of construction of PDVSA tankers.  Sun Decl., Ex. 28.  In February 2020, CITGO Petroleum released a statement that Maduro's regime

utilized "its control of PDVSA in Venezuela" and used Venezuela's military to take possession of CITGO Petroleum's crude oil that was meant for delivery overseas. *See* Sun Decl., Ex. 21.

On February 19, 2020, Maduro ordered PDVSA employees to attack Interim President Guaidó on national television, forcing them to claim, among other things, that Guaidó was to blame for the U.S. sanctions. Sun Decl., Ex. 29. An Argentinian news website called *InfoBae* reported allegations that a PDVSA employee was arrested after criticizing Maduro's regime at a company meeting. Sun Decl., Ex. 30.

On April 27, 2020, Maduro installed, as president of PDVSA and its board of directors, Asdrúbal Chávez, a cousin of Hugo Chávez, the deceased Venezuelan strongman. Sun Decl., Ex. 31. Maduro had previously appointed Asdrúbal Chávez as president of CITGO Petroleum. Sun Decl., Ex. 32. Maduro also appointed Tarek El Aissami as Minister of Petroleum, and directed him—via a presidential decree—to restructure the oil industry, including PDVSA. Sun Decl., Exs. 31, 33. Wanted in the United States for narcotics trafficking, El Aissami previously served as Venezuela's economy vice president, and is a long-time Maduro lieutenant and former close ally of Hugo Chávez. Sun Decl., Exs. 34, 35, 36, 95.

Asdrúbal Chávez and El Aissami have taken actual control of PDVSA's corporate enterprise. On June 1, 2020, as Chávez toured gas stations around Caracas to demonstrate that fuel was being distributed to the public, he attributed the availability of fuel to the Maduro government, publicly announcing that "[w]e have also been receiving some problems and we have made the corresponding decisions *following the instructions of President Nicolás Maduro and Minister Tareck El Aissami*." Sun Decl., Ex. 38 (emphasis added). On June 27, 2020—acting not under the control of the ad hoc board, but as directed by Venezuela's Ministry of Petroleum through the National Executive—PDVSA rescinded agreements with various Venezuelans who

licensed service stations, *seizing them for the state.*  Sun Decl., Ex. 37.  A month earlier, PDVSA had declared to the owners that PDVSA was authorized to rescind commercial agreements *by governmental decree,* thus acknowledging that PDVSA exercises the power of the state up to and including the expropriation of property for the state.  Sun Decl., Ex. 37.

On May 31, 2020, Maduro announced on the Venezuelan state television network that PDVSA would increase consumer prices.  Sun Decl., Ex. 39.  During that same briefing, he specified how PDVSA would sell gasoline and to whom.  Sun Decl., Ex. 39.  A press release published on PDVSA's website advised that President Maduro announced the new gasoline pricing scheme.  Sun Decl., Ex. 40.  Consumer prices were increased by PDVSA pursuant to this instruction.  To this day, Maduro makes announcements in PDVSA's offices and PDVSA's own press releases to announce Venezuelan government policy.  Sun Decl., Ex. 33.

In July 2020, a close observer of facts on the ground in Venezuela observed, "[t]he campaign to replace President Nicolas Maduro has fizzled . . .  While Maduro and opposition leader Juan Guaido both claim to be president, Maduro maintains control of key assets including the military, media, police and state-run oil company Petroleos de Venezuela SA, or PDVSA."  Sun Decl., Ex. 41.

Maduro's control over PDVSA and its management was exercised most recently in July 2021 when he appointed two new vice presidents for PDVSA, as published in Venezuela's Official Gazette.  Sun Decl., Ex. 42.  Maduro also directly appointed the Vice Minister of Hydrocarbons, Erick Jacinto Pérez Rodríguez as the new president of Corporación Venezolana del Petróleo, a PDVSA subsidiary.  Sun Decl., Ex. 42.

### iii.    The Venezuelan State's Economic Control Over PDVSA

***The Nynas Transaction***.  A May 2020 transaction highlights the global control that Venezuela (through Maduro's political actors) still exerts over PDVSA in spite of the appointment

15

of the Guaidó ad hoc board.  Acting through its European subsidiary, PDV Europa, PDVSA sold a significant and valuable stake in Nynas, a Swedish oil refinery.  Sun Decl., Exs. 43, 44.  After the fact, the ad hoc board criticized the sale as a "harm to the nation's wealth supported by agents of the Maduro regime," and Reuters reported that the ad hoc board "*was not informed of the company's sale of a 35% stake in Swedish refiner Nynas.*"  Sun Decl., Ex. 44 (emphasis added).  The ad hoc board literally conceded that it does not know what PDVSA is doing.  That the sale could have been effected over its objection—and without its knowledge—shows that actual state control of PDVSA has not changed since 2018.

***The Refidomsa Transaction***.  In August 2021, PDVSA sold a 49% stake held by PDVSA subsidiary PDV Caribe, S.A. in a Dominican refinery, Refidomsa.  Sun Decl., Ex. 45.  In connection with the transaction, Venezuelan Minister of Petroleum Tareck El Aissami stated on Twitter that the transfer of Refidomsa shares was "in exchange for the receipt of international debt denominated in foreign currency, *issued by PDVSA and the Bolivarian Republic of Venezuela.*"  Sun Decl., Ex. 46 (emphasis added).  El Aissami confirmed that both "[t]he Bolivarian Government of Venezuela and PDVSA successfully conclude[d] the negotiation of REFIDOMSA."  Sun Decl., Ex. 46 (emphasis added).  An official communication—issued on Venezuelan government letterhead but posted on PDVSA's website—further confirms that "[a]s a result of this transaction, *the Bolivarian Republic of Venezuela and PDVSA* were able to reduce their public external debt…."  Sun Decl., Ex. 47 (emphasis added).  This asset exchange resulted in a $42.9 million loss to PDVSA, which had acquired the 49% Refidomsa stake in 2010 for $131 million.  Sun Decl., Ex. 48.  The exchange and resulting loss were highly criticized by the Guaidó opposition.  *Id.*

*Venezuela's Sale of PDVSA Oil to China*.  It has been widely reported that Venezuela has serviced its sovereign debt to China by delivering PDVSA oil directly to China in repayment of government loans.  Sun Decl., Ex. 49.  Indeed, it has been reported that "PDVSA often sells its crude at steep discounts, and some of its sales go to pay down debt rather than generate cash."  Sun Decl., Ex. 50.  Moreover, around August 2020, Venezuela's government, through Mr. Maduro, negotiated an agreement with Chinese banks for a grace period until the end of the year on approximately $19 billion in loans that were "paid off with oil shipments."  Sun Decl., Ex. 87; *see also*, Sun Decl., Ex. 88.  Following this report, in late November 2020, "PDVSA documents and vessel tracking data . . . confirmed that two China-flagged very large crude carriers (VLCC) with the capacity to transport some 2 million barrels of crude each loaded Venezuelan heavy crude at the Jose terminal in recent days."  Sun Decl., Ex. 89.  Therefore, despite U.S. sanctions, according to news reports published as recent as December 2021, Venezuela continues to surreptitiously ship millions of barrels of oil to China, Sun Decl., Ex. 51, presumably to service its debt to the Chinese government.

### iv.   The Venezuelan State's Continued Use of PDVSA Assets for Its Own Benefit

*Use of PDVSA's Aircraft*.  Between 2019 and 2021, state ministers and Maduro allies continued to use PDVSA property.  In March 2019, Venezuela's Minister of Foreign Affairs, Jorge Arreaza, traveled abroad on board a PDVSA plane.  *See* Sun Decl., Ex. 52.  In early 2020, in identifying numerous PDVSA aircraft as blocked property, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") confirmed that "[PDVSA] Falcon 200EX (YV3360) . . . was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets . . .  In the spring of 2019, during a joint operation conducted by PdVSA and the Venezuelan Integrated Air

17

Command, PdVSA's Learjet 45XR (YV2567) attempted to interfere with a U.S. military aircraft in the northern Caribbean Sea." Sun Decl., Ex. 53. OFAC also stated that "[i]n late Summer 2019, Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez . . . attended an OPEC meeting in the United Arab Emirates and utilized the PdVSA aircraft Falcon 200EX (YV3360)." Sun Decl., Ex. 53.

In 2019, Maduro sent an aircraft registered to PDVSA to Guinea-Bissau in a (failed) attempt to bring Alex Saab back from the island nation of Cape Verde. Sun Decl., Ex. 54. Saab, a Columbian national and a close Maduro ally, was captured by local police on a warrant from the United States when his plane stopped to refuel in Cape Verde. Sun Decl., Exs. 55, 56. In March 2020, Venezuelan officials appointed by Maduro traveled to Trinidad & Tobago aboard a PDVSA aircraft. Sun Decl., Ex. 57.

On January 19, 2021, OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption to exploit and profit from Venezuela's natural resources." Sun Decl., Ex. 58. Indeed, on November 3, 2021, a PDVSA plane was used by former president of Bolivia, Evo Morales, to travel from Bolivia to Argentina to attend the presentation of his new book. Sun Decl., Exs. 59, 60. Morales's use of PDVSA property was likely a political favor, as Morales is widely regarded as one of Maduro's "greatest allies," having made a surprise visit to Caracas in February 2019 to show his support for Maduro when Guaidó was proclaimed interim president of Venezuela. Sun Decl., Ex. 60.

***The Citgo 6***. In November 2017, six Citgo executives—five Venezuelan-born U.S. citizens and one Venezuelan-born U.S. permanent resident—were summoned from Houston to an urgent "CITGO Petroleum business meeting" in Caracas. Sun Decl., Ex. 62, *see also* Sun Decl., Ex. 61. A Citgo-owned private jet transported these men to Venezuela. However, "[o]nce in the

conference room *at the PDVSA headquarters in Caracas*, armed, masked security agents arrested the men" and imprisoned them on "specious charges without due process or access to a fair trial." Sun Decl., Ex. 63 (emphasis added); *see also* Sun Decl., Ex. 62.  A source to CNN confirmed that "[t]he order to detain them and the way it happened is an instruction by Maduro to sow terror, to generate fear."  Sun Decl., Ex. 61.  Indeed, the day after their arrest, in a national televised news conference, Maduro stated that "[t]hese people were born in Venezuela, they are Venezuelan, and will be judged as corrupt, thieves and traitors to the homeland . . .  My blood boils when I think about them, they are cheaters and the full weight of the law must fall on them."  Sun Decl., Ex. 61. Venezuelan state-controlled news reported that the Citgo 6 were detained by the Bolivarian National Intelligence Service, SEBIN.  Sun Decl., Ex. 64.  The OAS described SEBIN as "the political police of the Bolivarian Government," while a UN human rights report confirmed that SEBIN "have been responsible for arbitrary detentions and the ill-treatment and torture of political opponents and their relatives."  Sun Decl., Ex. 65, n. 90; *see also* Sun Decl., Ex. 66, ¶ 32.

Other sources to CNN confirmed the political nature of the arrests of the Citgo 6, which "provided the regime with such targets as anti-government protests escalated in 2017" and happened when "Maduro needed scapegoats as Venezuela's economy collapsed in a tide of corruption and mismanagement of PDVSA and the oil industry."  Sun Decl., Ex. 61.  Ever since, the Citgo 6 "have been used as bargaining chips by the Venezuelan government."  Sun Decl., Ex. 61.  In 2020, Maduro's regime sought to exchange the Citgo 6 for Maduro's close ally, Alex Saab. Sun Decl., Exs. 63, 67.  In October 2021, within hours of Saab's extradition, Venezuela revoked the house arrest of the Citgo 6 in an "apparent retaliation for Saab's extradition."  Sun Decl., Ex. 68, *see also* Sun Decl., Ex. 69.  In early December 2021, a top U.S. diplomat traveled to Venezuela to meet with the Citgo 6 as part of the current U.S. administration's ongoing efforts to seek their

release.  Sun Decl., Exs. 70, 71.  The "Maduro government was accommodating of the visit" and worked with the U.S. government to arrange the visit.  Sun Decl., Ex. 70.  As of the date of this motion, the Citgo 6 remain incarcerated in SEBIN's headquarters, El Helicoide prison, which holds "the government's top opponents."  Sun Decl., Ex. 71, *see also* Sun Decl., Exs. 65, at 82, 66, ¶ 46.

### v.      Use of PDVSA as State Information Ministry

PDVSA's website lists three "Strategic Objectives," one of which is to "[s]upport the geopolitical positioning of Venezuela internationally."  Sun Decl., Ex. 72.  Venezuela exercises direct control over distribution of the state's petroleum through PDVSA, both domestically and as a matter of foreign relations to benefit Venezuela.  On March 3, 2020, *ABC* reported that Venezuela (via Maduro) was sending  "PDVSA" petroleum to Cuba, despite Venezuela's own fuel shortage.  Sun Decl., Ex. 73.  *Reuters* reported that in November 2021 "[a]n average of 77,000 bpd of crude, jet fuel and gasoline were shipped to Venezuela's top political ally, Cuba."  Sun Decl., Ex. 74.

PDVSA's social media accounts are the state's mouthpiece, regularly trumpeting the Maduro regime's policy and propaganda.  PDVSA's Twitter account tweets and retweets support for state initiatives, political actors and policies.  For example, between January 30, 2022, and February 7, 2022, PDVSA's official Twitter account has retweeted at least 70 of Maduro's tweets.  Sun Decl., Ex. 92.

In 2018, PDVSA regularly tweeted that "PDVSA is Venezuela," *see Crystallex I,* 333 F. Supp. 3d at 407.  It still is.  As recently as April 20, 2021, that message continued with "[i]n PDVSA we think as a Nation" or as a "Country."  Sun Decl., Exs. 93, 94.

### vi.     The U.S. Sanctions Regime

Throughout this period, U.S. sanctions have remained firmly in place on Venezuela and PDVSA.  This confirms that in the U.S. government's view, the appointment and recognition of

Guaidó has not worked any change in Venezuela itself, nor on its relationship with PDVSA.  The United States would hardly *reaffirm* economic sanctions on a sovereign (or its instrumentality) that is *actually* controlled by an allied government whose ascension it supports and, presumably, it hopes will succeed.  *See* Sun Decl., Ex. 75 ("Sanctions are intended to change behavior. . . .  As Venezuela's state-owned oil company, PdVSA has long been a vehicle for corruption.").  Two days after recognizing Guaidó as the Interim President of Venezuela, the President issued Executive Order 13857 to amend the definition of "Government of Venezuela" used in prior sanctions to *explicitly include PDVSA.  See* Sun Decl., Ex. 76 (Executive Order 13857 § 1(a)).

In January 2019, OFAC acknowledged that the state's domination of PDVSA—which the *Crystallex I* court had identified five months earlier—was unchanged.  It stated that "[t]he path to sanctions relief for PdVSA and its subsidiaries is through the expeditious *transfer of control of the company* to Interim President Juan Guaidó or a subsequent, democratically elected government . . . ."  Sun Decl., Ex. 77 (emphasis added).  The statement implicitly acknowledges that control did not then lie with Guaidó.  Today, as the Court is surely aware, sanctions remain in place; one of many factors showing that the "transfer of control of [PDVSA]" from Maduro (and the Venezuelan state) has not occurred.

In August 2019, the United States reaffirmed the connection between Venezuela and PDVSA: "the term 'Government of Venezuela' includes . . . Petroleos de Venezuela, S.A. (PdVSA)."  Sun Decl., Ex. 78 (Executive Order 13884 § 6(d)).  Specifically, Executive Order 13884 stated that the "Government of Venezuela" also includes "any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime.*"  Sun Decl., Ex. 78 (Executive Order 13884 § 6(d)) (emphasis added).  In so doing, the United States acknowledged that while Guaidó enjoyed a diplomatic

status as the representative authorized to speak for Venezuela in the United States, Venezuela itself remained as firmly within the control of the Maduro regime as it had been a year earlier, when the *Crystallex I* court ruled.

### vii.    The Guaidó Government

As discussed above, the ad hoc board appointed by Guaidó and the Guaidó government has not effected any change in the 2018 status quo; it has largely been relegated to the sidelines and left to complain about the actions taken by those who actually control PDVSA, who are affiliated with Maduro.  Nevertheless, with the limited means available to him, Guaidó has himself tried to assert governmental control over PDVSA and treats PDVSA's assets and revenues as though they are available for general governmental purposes.

First, the appointment of the ad hoc board itself was itself highly irregular and a clear demonstration of the Venezuelan state's direct and total control over PDVSA.  As set forth above, the Transition Statute empowered Guaidó to appoint a special Board of Directors for PDVSA that could exercise its rights as PDVH's shareholder, including through the selection of board members for PDVH, Citgo, and other affiliates.  *Jiménez*, 250 A.3d at 825 n. 22 (citing Article 34 of the Transition Statute).  As one expert—Professor Manuel A. Gomez—has opined in connection with the application of another creditor of Venezuela to attach the PDVH shares, "[b]y virtue of the exception legal regime created by the National Assembly through the [Transition Statute] and other formal acts … Guaidó and his appointees have been given unfettered authority to exercise considerable control over PDVSA, PDV Holding and Citgo."  Sun Decl., Ex. 5, ¶ 19.  Further, on April 2, 2019, the National Assembly enacted an "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDVSA" that further expanded Mr. Guaidó's controls over PDVSA by allowing him to expand the authority of PDVSA's board by special decree, and by suspending all rights and authorities otherwise vested in PDVSA's the Shareholders' Meeting, the

Board of Directors, and the Presidency of PDVSA and its affiliates.  Sun Decl., Ex. 5, ¶ 20.  This law also suspended any functions given to the Minister of Hydrocarbons and any other government official, branch or agency related to PDVSA, which existed by or was given any functions after January 10, 2019, replacing the previous legal framework for PDVSA's governance with "total control" of Mr. Guaidó's government.  Sun Decl., Exs. 27, 90, 91, 98, 99, 100.  As Mr. Gomez opines, under this new legal framework, it is the position of the Guaidó administration that every PDVSA contract with a foreign national must be approved by the legislature consistent with Article 36 of the Transition Statute which precludes the disposal of any funds belonging to PDVSA or any other state-owned entity until after the Maduro regime relinquishes power without express authorization from the National Assembly.  *See* Sun Decl., Ex. 5, ¶ 22.

A declaration from the author of the Transition Statute (Mr. Jose Ignacio Hernández), which was submitted in a different case involving Venezuela in this Court, confirms and illustrates this point.  Couched as rules to "restore the autonomy" of PDVSA's U.S. assets, the Transition Statute does the opposite by purporting to implement state mandates directly over *PDVSA's assets and subsidiaries*.  "[T]he business *of PDV Holding, Inc. and its subsidiaries* shall follow commercial efficiency principles, *subject only to the control and accountability processes exercised by the National Assembly, and other applicable control mechanisms.*"  Sun Decl., Ex. 85, ¶ 12 (emphasis added).  Mr. Hernández notes that "[t]he 'other applicable control mechanisms' include, for example, general rules established in Venezuelan public law applicable to state-owned enterprises," and that the Interim Government (rather than PDVSA itself) "remove[d]" the boards of PDVSA's U.S. subsidiaries and reappointed new boards.  Sun Decl., Ex. 85 at 5 n.11, ¶ 14.  Guaidó has influence over only one of a few indirect subsidiaries of one of the twenty-eight operating subsidiaries in PDVSA's global operation, but in that one corner of the commercial

enterprise, his effort to assert government control ignores *PDVSA's* status as the owner of those subsidiaries.

Guaidó's asserted government draws directly from PDVSA commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends.  Sun Decl., Exs. 79, 80 ("[T]he Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company, PDVSA.").  In 2017, President Maduro decreed that "*Venezuela* would restructure the external debt of *both Venezuela and PDVSA.*" *Crystallex II,* 932 F. 3d at 147-48 (emphasis added).  In July 2019, *Guaidó* made a nearly identical promise: "no different treatment shall be accorded to eligible . . . claims as a result of . . . the identity of the public sector obligor (the Republic, PDVSA or another public sector entity . . . .[)]."  Sun Decl., Ex. 81.

The ad hoc board's Twitter feed regularly tweets messages in support of the Guaidó government and refers to PDVSA's assets as assets of Venezuela.  *See* Sun Decl., Ex. 82 ("The ad hoc PDVSA Board continues to work actively to recover *Venezuela's* assets abroad . . . ." (emphasis added)); Sun Decl., Ex. 83 ("The new CITGO Board of Directors is cooperating with North American courts of law to safeguard *Venezuela's assets* and determine responsibility." (emphasis added)); Sun Decl., Ex. 84 ("[CITGO's] value and potential is incalculable, we must recover it and put it at the service of Venezuelans.").  In late 2019, the National Assembly (which supports Guaidó) declared *PDVSA* bonds to be void and illegally issued.  *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.,* 2020 WL 6135761, at *6 (S.D.N.Y. Oct. 16, 2020). In the eyes of all of its representatives, apparently, Venezuela regards debt of the state as debt of PDVSA and vice versa.  PDVSA itself has emphasized the control of the government over its operations and defined its constitutional role to "manage the [Venezuelan] oil industry," including

24

CITGO — the "'crown jewel' and most economically and strategically important foreign asset of national [Venezuelan] public interest." *See* PDVSA Memorandum of Law in Support of Motion for Summary Judgment, *Petroleos De Venez. S.A. et al v. MUFG Union Bank, N.A. et al*, No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), D.I. 117, at 31; *see also id*. at 30 n. 84 (stating that "[t]here is no dispute that PDVSA and PDVSA Petróleo, which are 'attached' to (and thus controlled by) Venezuela's Ministry of Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic").

The Guaidó government has continued to assert Venezuela's economic control over both PDVSA and PDVSA's assets. Indeed, the Guaidó government has established a special fund derived from assets in the United States previously controlled by the Maduro government, earmarked to pay for the legal defense of Venezuela in foreign and international proceedings. Sun Decl., Ex. 101.

## III.   ARGUMENT

### A.   Venezuela Owns Property in this District Through Its Alter Ego PDVSA

#### 1.   Alter Ego Doctrine

The Supreme Court has held that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created . . . one may be held liable for the actions of the other." *Bancec*, 462 U.S. at 629. To guide courts' determination of whether an alter ego relationship exists, the Supreme Court identified five "*Bancec* factors," which the Third Circuit applied in *Crystallex*, namely: "(1) the level of economic control by the government, (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would

entitle the foreign state to benefits in the United States while avoiding its obligations." *Crystallex II*, 932 F.3d at 141 (citing *Rubin*, 138 S. Ct. at 823).

The Third Circuit has held that courts apply the *Bancec* test under a "preponderance of the evidence" standard. *Crystallex II*, 932 F.3d at 145-46. Notably, as the *Crystallex* court observed, "any creditor may be able to find support (perhaps strong support) in the record created in the Crystallex Asset Proceeding and the finding reached (and affirmed) there." *Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *8 (D. Del. Dec. 12, 2019). The evidentiary record in *Crystallex*, combined with the new evidence submitted along with Rusoro's instant motion, definitively show that by a preponderance of the evidence, and applying the *Bancec* factors, PDVSA has, at all relevant times, been completely dominated by, used as an agent of, and is an alter ego of Venezuela.

### 2.  Venezuela is Collaterally Estopped from Arguing that PDVSA is not an Alter Ego of Venezuela

It is undeniable that the Venezuelan state, and not a particular leader or administration, is the judgment debtor in these proceedings. *See, e.g.*, *Republic of Iraq v. ABB AG*, 768 F.3d 145, 164 (2d Cir. 2014) ("The obligations of a foreign state are unimpaired by a change in that state's government."). Among Venezuela's assets is PDVSA, a state-owned company that engages in, among other activities, the exploration, production, and sale of oil and natural gas through various subsidiaries across the world. One of these subsidiaries, PDVH, is based in this District.

Collateral estoppel—or "issue preclusion"—applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992). Each of these elements is

satisfied here.[6]   In August 2018, the *Crystallex I* court ruled on this precise issue, holding that "PDVSA is the alter ego of Venezuela," *Crystallex I*, 333 F. Supp. 3d at 406, and that "PDVSA may be deemed the alter ego of Venezuela pursuant to the exclusive control prong of *Bancec* and its progeny," *id.* at 414, *aff'd Crystallex II*, 932 F.3d at 152.   Venezuela and PDVSA both opposed Crystallex's motion, and the parties fully litigated the alter ego issue.   Notably, the Third Circuit stated that "if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."  *Crystallex II*, 932 F.3d at 152.

To the extent Venezuela opposes the application of collateral estoppel based on the court's ruling in *Crystallex*, 2019 WL 6785504, at *8, that "any creditor seeking to place itself in a situation similar to Crystallex will have to prove that PDVSA is and/or was the Republic's alter ego on whatever pertinent and applicable date," it is well-settled that the "pertinent" time for the purposes of a determination of alter ego liability is the date of the injury.  *See Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017) (finding that a plaintiff could state a claim for alter ego liability under ERISA by "claiming that [one company] was [another's] alter ego when the withdrawal liability arose," *i.e.*, "at the times pertinent"); *Energy Marine Servs., Inc. v. DB Mobility Logistics AG*, 2016 WL 284432, at *3 (D. Del. Jan. 22, 2016) (identifying "the relevant time frame" for the purposes of determining alter ego liability as "the time of the disputed charter party agreement"); *Greene v. New Dna Perfume Corp.*, 287 B.R. 328, 343 (Bankr. D. Del. 2002) (analyzing the parties' "separate corporate existence at the time in question," namely, the relevant

---

[6]   Courts, including a court in this District, have held that an alter ego finding may be asserted offensively for issue preclusion purposes.  *See, e.g.*, *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 625 (D. Del. 2018) ("noting that "[n]umerous courts have indicated that a finding that one company is the alter ego of another may be subject to offensive issue preclusion/collateral estoppel"); *see also Twin City Pipe Trades Serv. Assoc, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 676-78 (8th Cir. 2017) (affirming district court's application of offensive collateral estoppel on the issue of alter ego liability); *Jaffe v. Grant*, 793 F.2d 1182, 1188 (11th Cir. 1986) ("[T]he district court found that [appellant] was in privity with the corporations, indeed their alter ego, and thus, he is as bound by the Supplemental Final Judgment as the corporations.").

period in which the wrongful conduct was alleged to have taken place); *Trs. Of Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 457 (E.D. Pa. 2001), *aff'd sub nom.*, 332 F.3d 188 (3d Cir. 2003) ("[T]he relevant time period is the time at which the corporation incurred liability."). Rusoro, like Crystallex, was injured by Venezuela's unlawful acts that occurred over a decade ago in 2011, and both parties obtained arbitration awards and U.S. court judgments during the time period analyzed by the *Crystallex I* court in reaching its alter ego determination. As a result, Venezuela is barred from relitigating the alter ego issue.

### 3.    PDVSA Continues to Be an Alter Ego of Venezuela

Even if Venezuela could relitigate the alter ego issue—which it cannot—the evidence conclusively demonstrates that the relationship between Venezuela and PDVSA has remained unchanged since the *Crystallex I* court's alter ego determination in August 2018. For the reasons discussed below, the overwhelming weight of the evidence shows that each of the *Bancec* factors strongly favors an alter ego finding, and that PDVSA has been since August 2018, and continues to be, a key organ of the Venezuelan government masquerading as an independent company, one over which Venezuela exercises control that is "so extensive that entity separateness fades away as a legal distinction." *Crystallex II*, 932 F.3d at 146.

#### a.    *Factor 1: Venezuela Retains Economic Control of PDVSA*

PDVSA was created by the Venezuelan Constitution as a tool of the Venezuelan state and has remained such at all relevant times. *See supra* Section II.C.3.a. This fact is recognized by the U.S. government, which has repeatedly affirmed that for purposes of economic sanctions, the "Government of Venezuela" includes PDVSA and all current political actors of Venezuela (including both the Guaidó government and the Maduro regime). *See supra* Section II.C.3.c.vi. In fact, the U.S. has included PDVSA as a sanctioned entity *precisely because* it is an arm of Venezuela. Moreover, since the court's August 2018 ruling in *Crystallex I*, the Maduro

government has continued to assert Venezuela's economic control over both PDVSA and PDVSA's assets. *Id.*

### b.      Factor 2: PDVSA's Profits Go to Venezuela

The record reflects that as PDVSA's lone shareholder, all of PDVSA's profits ultimately run to the Venezuelan government. *See supra* Section II.C.3.c.iv; *see also supra* n. 1. The evidence further demonstrates that PDVSA's global corporate revenues and assets—from sales in and to Lisbon, Moscow, China, Iran, and Turkey, to control of service stations in Caracas, to the use of aircraft—continue to prop up the Venezuelan state, and that PDVSA, through its official website and social media accounts, continues to act as a state information ministry. *Id.*

### c.      Factor 3: Venezuelan State Officials Manage PDVSA and Are Closely Involved in PDVSA's Daily Affairs

As discussed above in Section II.C.2, Venezuela continues to appoint officials, fire employees, and utilize PDVSA assets for state purposes. The state also continues to dominate and control substantially all of PDVSA's global operations, board(s), officers and employees, refineries, rigs, service stations, tankers, offices, website and messaging, aircraft, commercial contracts, pricing, establishment of new offices abroad, dispositions of assets, and factoring efforts to avoid U.S. sanctions. Indeed, none of Venezuela's state officials' actions with respect to the day-to-day oversight over PDVSA's operations has been impacted by the recognition of the Guaidó administration or the establishment of the ad hoc board. This is further confirmed by the U.S. sanctions regime, which treats PDVSA's assets and operations as being under the control of Venezuela.

### d.      Factor 4: Venezuela Is the Real Beneficiary of PDVSA's Conduct

In *Crystallex II*, the Third Circuit noted that Venezuela extracts value from PDVSA without paying the company. *Crystallex II*, 932 F.3d at 148. This has been true at all relevant

times and continues to be true today.  As discussed in Section II.C.2 above, Venezuela has used, and continues to use, PDVSA to achieve its social and political objectives domestically and abroad. For example, it has been widely reported that Venezuela makes debt service payments to China by sending PDVSA oil to China in repayment of loans.  Recent news reports have revealed that despite sanctions, millions of barrels of PDVSA oil continued to be shipped to China, suggesting that Venezuela's arrangement to send PDVSA oil to China to service Venezuela's debts remains ongoing.  *See supra* at Section II.C.3.c.ii.

Moreover, in August 2021, PDVSA sold a 49% stake held by a PDVSA subsidiary in a Dominican refinery, Refidomsa, to buy back defaulted bonds issued by both PDVSA and Venezuela.  *See supra* at Section II.C.3.c.iii.  PDVSA had previously acquired the stake in 2010 for $131 million, and the transaction resulted in a $42.9 million loss to PDVSA.  Venezuela was therefore able to exercise its control over PDVSA to direct PDVSA's subsidiary to incur a significant loss in order to retire debt owed by Venezuela.  Courts have found an alter ego relationship where a parent exercises control over a subsidiary and causes it to undertake actions that benefit the parent to the detriment of the subsidiary and its creditors.  *See, e.g.*, *In re Buckhead America Corp.*, 178 B.R. 956, 975 (D. Del. 1994) (denying motion to dismiss and endorsing theory of alter ego liability based on allegation that "[owner of two corporations] used [the two corporations] to enrich himself to the detriment of the corporations and their creditors" (quoting *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1002 (S.D.N.Y. 1991)); *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001) (finding that "parents may be 'directly' liable for their subsidiaries' actions when . . . [a parent] has forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct legal personality"); *Federal Deposit Ins. Corp. v. Sea Pines Co.*, 692 F.2d 973, 977-78 (4th Cir. 1982) (finding that the actions

of a parent and insolvent subsidiary, which used its assets for the benefit of the parent, were fundamentally unfair to subsidiary's creditor and justified piercing of the corporate veil of the parent).

> **e.    Factor 5: Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States While Avoiding Its Obligations**

A determination that PDVSA today is no longer an alter ego of Venezuela would permit Venezuela to use the U.S. judicial system to effectively eliminate any recovery for Rusoro on its Judgment.  As the Third Circuit stated, "Venezuela owes [plaintiff] from a judgment that has been affirmed in our courts. Any outcome where [the U.S. judgment creditor] is not paid means that Venezuela has avoided its obligations." *Crystallex II*, 932 F.3d at 149.  Plainly, to allow Venezuela to continue enjoying the benefit of the use of PDVSA's assets while simultaneously avoiding its obligations to its creditors would be a gross injustice.

The circumstances surrounding the Citgo 6 further illustrate the extent to which the Maduro regime uses PDVSA for its own political benefit.  As discussed above in Section II.C.3.c.ii, through its control of PDVSA, the Venezuelan state lured Citgo's U.S.-based executives into traveling from Houston to PDVSA's headquarters in Caracas, then used the state's police power to detain and imprison those individuals for the purpose of making them political scapegoats for the Maduro regime.  More recently, the Maduro regime has attempted to use these executives, who remain imprisoned in Venezuela, as bargaining chips to orchestrate a diplomatic prisoner swap with the United States for the return of one of Mr. Maduro's close political allies.  The Maduro government would not have had access to these U.S. citizens in the first place absent its control over PDVSA.

### 4.      Recognition of the Guaidó Government Does Not Change the Analysis

To the extent Venezuela challenges an alter ego finding based on the U.S. government's recognition of Mr. Guaidó as "Interim President," such challenge fails as a matter of law and fact.

#### a.      Recognition of the Guaidó Government Is Legally Irrelevant

The U.S. government's recognition of the Guaidó government was not a recognition of a new or different Venezuela.  Indeed, it is well-settled that "[u]nder international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities."   Restatement (Third) of Foreign Relations Law § 201 (1987).   At no point since *Crystallex I* did Venezuela's territories, resources, people, borders, assets, and other attributes of existence change.  Its debt obligations remained the same, *see Republic of Iraq,* 768 F.3d at 164 ("The obligations of a foreign state are unimpaired by a change in that state's government."), as did its assets, including those held by PDVSA, over which the Venezuelan state has continued to exercise extensive control.  Recognition simply meant that, in the United States, a new spokesman was authorized to speak for the Venezuelan state.  *See Zivotofsky ex rel. Zivotofsky v. Secretary of State*, 725 F.3d 197, 205 (D.C. Cir. 2013), *aff'd,* 576 U.S. 1 (2015) ("Recognition is therefore a critical step in establishing *diplomatic* relations with the United States; if the United States does not recognize a state, it means the United States is unwilling to acknowledge that the government in question *speaks* as the sovereign authority for the territory it purports to control.").

#### b.      Mr. Guaidó's Actions Themselves Support an Alter Ego Finding

In any event, it has been widely recognized that since 2019, Mr. Guaidó has been unable to exert any real control over Venezuela, and many international organizations have reverted to recognition of the Maduro government.  *See* Sun Decl., Exs. 4, 15.  As discussed above in Section II.C.3.c, Venezuela's relationship with PDVSA has remained the same, with PDVSA trumpeting

Venezuelan policy on its website and social media and selling petroleum under state direction. The Venezuelan state manipulates, dominates, and controls PDVSA's assets and operations no less than it did in the years leading up to this Court's decision in 2018.

But importantly, even if the Court were to credit Mr. Guaidó as the legitimate ruler of Venezuela, it is clear that even he has tried to assert domination and control over PDVSA's assets and views it as an organ of the state.  For example, Mr. Guaidó has expressed his intent to utilize PDVSA's assets to restructure Venezuela's debt, and has purported to direct PDVSA's U.S. subsidiaries' operations on behalf of Venezuela.  *See supra* Section II.C.3.c.vii.  In other words, Mr. Guaidó has treated PDVSA *in the exact same manner* as Mr. Maduro, as an arm of the Venezuelan state.

### 5.     PDVSA's Shares of PDVH are Located in the United States

PDVSA's shares of PDVH are located in Delaware as a matter of law.  Under Delaware law, "[f]or . . . purposes of . . . attachment [and] garnishment . . . the situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . shall be regarded as in this State."  8 Del. C. § 169.  In addition, any other assets or rights belonging to PDVSA by virtue of its ownership of PDVH also are sited, and subject to execution, in Delaware.  *See D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038 (D. Del. 1974) (holding that debts and stock owned by Delaware corporations are sited in Delaware).  Accordingly, if this Court were to find that PDVSA is the alter ego of Venezuela, then Venezuela will be deemed to own property in the United States, through PDVSA's shares in PDVH, for the purposes of Section 1610.

### B.     Rusoro Satisfies the Remaining Jurisdiction Requirements Under the FSIA

### 1.     An Exception to Jurisdictional Immunity Applies

It is indisputable that the D.C. Court had jurisdiction over Venezuela, *see Rusoro*, 300 F. Supp. 137, at 146-49, and that "federal courts have ancillary jurisdiction to enforce their

judgments," *Crystallex II*, 932 F.3d at 136-37.  The Third Circuit has held that this ancillary jurisdiction applies to "a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment . . . [and] garnishment." *Id.* at 136.

Because Rusoro has established an exception to sovereign immunity and obtained a federal judgment pursuant to Chapter 2 of the Federal Arbitration Act and 28 U.S.C. § 1605(a)(6), it was authorized to enforce the Judgment in this Court pursuant to 28 U.S.C. § 1963.  *See Crystallex II*, 932 F.3d at 137 ("[W]hen a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment—here, the exception for confirming arbitration awards, 28 U.S.C. § 1605(a)(6)—that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court.").  As the Third Circuit established in *Crystallex II*, "[a]s the [D.C. Court] had jurisdiction over Venezuela . . . the Delaware District Court . . . also ha[s] jurisdiction." *Id.* at 138.

2.  **A Reasonable Period of Time Has Elapsed Following the Entry of Judgment and Relief Pursuant to 28 U.S.C. § 1610(c) is Warranted**

Section 1610(c) provides that when a judgment has been entered against a foreign state, attachment of the foreign state's property in the United States in execution of the judgment is only permitted once "the court . . . [has] determined that a reasonable period of time has elapsed following the entry of judgment . . . ." 28 U.S.C. § 1610(c).  It has been nearly four years since the D.C Court entered Judgment against Venezuela, which should readily satisfy the "reasonable" period standard under § 1610(c).  Indeed, in cases involving other creditors of Venezuela, courts in the District of Columbia found that the judgment creditors had demonstrated that a reasonable period had passed where: (i) less than one month had elapsed, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 16-cv-00661-RC, Order (D.D.C. June 9, 2017), and (ii) "over five

months" had elapsed, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 419 F. Supp. 3d 51, 54

(D.D.C. 2019), between the entry of judgment and the filing of the 1610(c) motion.

Accordingly, this Court should find that a "reasonable period" has elapsed for purposes of

§ 1610(c), and permit Rusoro to seek attachment to execute the Judgment.

### 3. An Exception to Immunity from Attachment or Execution Applies

This Court has jurisdiction over Rusoro's request for a writ of attachment *fieri facias*

pursuant to 28 U.S.C. § 1610(a)(6), as this enforcement proceeding is based on an order confirming

an arbitral award rendered against a foreign state. *See Rusoro*, 300 F. Supp. 149. Moreover, the

Third Circuit held in *Crystallex II* that "so long as PDVSA is Venezuela's alter ego under *Bancec*,

the District Court ha[s] the power to issue a writ of attachment on [PDVSA]'s non-immune assets

to satisfy the judgment against the country." *Crystallex II*, 932 F.3d at 139. As discussed above,

PDVSA was at all relevant times, and remains today, an alter ego of Venezuela.

### 4. The Property to Be Attached Is Used for a Commercial Activity in the United States

The FSIA permits a party holding a judgment against a foreign state to enforce that

judgment against assets that are used by the foreign state for a commercial activity in the United

States. 28 U.S.C. § 1610(a). The Supreme Court has held that assets are "commercial" for

purposes of the "commercial activity" exception to the FSIA when "[t]hey may be held by private

parties; they are negotiable and may be traded on the international market . . . ; and they promise

a future stream of cash income." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 615-17

1992). The court in *Crystallex* previously determined that PDVSA's shares of PDVH are being

used for a commercial activity. *See Crystallex I*, 333 F. Supp. 3d at 417 ("The Court finds by a

preponderance of the evidence that the PDVH shares are being 'used for a commercial purpose'

by PDVSA and, therefore, may be attached (and executed on) as property of Venezuela's alter

ego.").  Following that decision, the Third Circuit determined that even with OFAC sanctions in place, "the shares can still be used by PDVSA to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." *Crystallex II*, 932 F.3d at 151.  Accordingly, Venezuela's property—PDVSA's shares of PDVH—is being used for a commercial purpose and is therefore subject to attachment by a judgment creditor of Venezuela.

### C.   PDVH's Shares May Be Attached Under Delaware Law

Because each of the jurisdictional requirements under the FSIA have been met, Delaware law permits this Court to order grant the requested attachment.  Pursuant to Rule 69, a money judgment entered by a federal court "is enforced by a writ of execution, unless the court directs otherwise," and the "procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a).  Under Delaware law, judgment creditors may execute on their judgments by garnishment, which is "the attachment of a defendant's property in the hands of a third party." *UMS Partners, Ltd. v. Jackson*, 1995 WL 413395, at *5 (Del. Super. Ct. June 15, 1995).  Furthermore, "[t]he plaintiff in any judgment in a court of record . . . may cause an attachment, as well as any other execution, to be issued thereon, containing an order for the summoning of the garnishees, to be proceeded upon and returned as in cases of foreign attachment."  10 Del. C. § 5031; *see also Wilmington Tr. Co. v. Barron*, 470 A.2d 257, 263 (Del. 1983) ("The authority for [attachment on property not in a debtor's possession] is founded upon 10 Del. C. § 5031.").  Finally, Delaware law provides that a creditor may attach a debtor's shares in a Delaware corporation in order to satisfy the debt owed. *See* 8 Del. C. § 324.

### D.   OFAC Sanctions Do Not Preclude Granting the Requested Relief

At present, OFAC sanctions appear to prevent the issuance and service of a writ of attachment on PDVSA's shares of PDVH.  Sun Decl., Ex. 86 (OFAC Frequently Asked Question

808).  The sanctions do not, however, bar this Court from declaring that: (i) Rusoro is entitled to a writ of attachment, (ii) the writ will issue automatically upon the lifting of relevant sanctions or the issuance of a license permitting the writ to be issued and levied, and (iii) priority among Venezuela's creditors will take effect upon the issuance of the Court's declaration.  *See, e.g.*, *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 809-12 (D. Del. 1990) ("[B]locking regulations bar only those judicial proceedings that effect a transfer of foreign property or property interests . . . the President's statutory authority is limited to regulating those judicial processes that would effect a transfer of foreign property or property interests.").  Indeed, Rusoro seeks the same relief that the court granted to Crystallex, a determination that it is entitled to a writ.  *See Crystallex I*, 333 F. Supp. 3d at 426 ("The Clerk of Court is directed not to issue the writ of attachment until after the Court issues an additional Order following its review of the forthcoming status report.").

## IV.    CONCLUSION

For the foregoing reasons, Rusoro respectfully requests that this Court enter an order: (i) finding that a reasonable period of time has elapsed following the entry of the Judgment to begin execution in aid of the Judgment in accordance with 28 U.S.C. § 1610(c); and (ii) authorizing the Clerk of Court to issue a writ of attachment *fieri facias* against the shares of PDVH.

Dated:  Wilmington, Delaware
        February 9, 2022

                                Respectfully submitted,

                                /s/ R. Craig Martin
                                R. Craig Martin (DE Bar No. 005032)

                                DLA Piper LLP (US)
                                1201 North Market Street
                                Suite 2100
                                Wilmington, DE 19801

Tel: (302) 468-5655
Fax: (302) 778-7834
Craig.Martin@us.dlapiper.com

James E. Berger
Charlene C. Sun
Joshua S. Wan
Katherine A. Ibarra
Tamara Hilmi

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4715
Fax: (212) 884-8715
James.Berger@us.dlapiper.com
Charlene.Sun@us.dlapiper.com
Joshua.Wan@us.dlapiper.com
Kathy.Ibarra@us.dlapiper.com
Tamara.Hilmi@us.dlapiper.com

*Attorneys for Plaintiff*